## JESSE JUTKOWITZ *v.* DEPARTMENT OF HEALTH SERVICES ET AL.
### (14141)

PETERS, C. J., CALLAHAN, GLASS, COVELLO and BORDEN, Js.

Argued April 23—decision released August 13, 1991

*Hanon W. Russell,* for the appellant-appellee (plaintiff).

*Henry A. Salton,* assistant attorney general, with whom were *Paul J. Lahey,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Richard J. Lynch,* assistant attorney general, for the appellees-appellants (defendants).

CALLAHAN, J. This case is an administrative appeal from the decision of the defendant state board of chiropractic examiners (board) to discipline the plaintiff chiropractor, Jesse Jutkowitz, for allegedly improper conduct in the treatment of certain patients. The disciplinary proceeding arose out of a complaint filed by the named defendant, the department of health services (department). As a result of that proceeding, the plaintiff's chiropractic license was suspended for one year, he was ordered to pay fines totalling $5000 and he was placed on probationary status for a period of three years. The plaintiff, a chiropractor licensed by the state of Connecticut, filed an administrative appeal in the Superior Court. The trial court sustained the appeal as to certain of the counts filed against the plaintiff and dismissed the appeal as to the other counts. After the plaintiff filed an appeal and the defendants filed a cross appeal in the Appellate Court, we transferred the matter to this court pursuant to Practice Book § 4023. We now affirm the judgment of the trial court.

The material facts are not in dispute. After complaints concerning the plaintiff had been made to the department, it brought a disciplinary action in twenty-four counts. The department alleged that, in the course of providing chiropractic services, the plaintiff had engaged in illegal and incompetent conduct and material deception in violation of General Statutes § 20-29.[1] The conduct at issue involved the treatment of three patients during 1982 and 1983. The board charged that the plaintiff had engaged in incompetent practice in diagnosing Mark Spivey and in advising him that his

[1] General Statutes § 20-29 provides in pertinent part: "The board of chiropractic examiners may take any of the actions set forth in section 19a-17 for any of the following reasons . . . violation of any provisions of this chapter or regulations adopted hereunder, engaging in fraud or material deception in the course of professional services or activities . . . or illegal, incompetent or negligent conduct in the practice of chiropractic."

scoliosis was caused by emotional or psychological factors. The board also claimed that the plaintiff had engaged in illegal and incompetent conduct and material deception in the treatment of Cheryl Benham and her husband, Richard Benham. Those allegations arose out of certain representations made by the plaintiff and out of his use of x-rays. The charges also concerned the plaintiff's use of a procedure known as the coccygeal-meningeal manipulation, which involves a manual intra-rectal examination and manipulation.[2] The plaintiff performed this procedure on Cheryl Benham on several occasions and advised her that proper chiropractic adjustment required this procedure. In addition, after learning that Cheryl Benham would be taking a trip by plane, the plaintiff instructed her to perform this procedure on herself during the flight. The plaintiff also advised Richard Benham of the necessity of this procedure, but he did not agree to it.

When the hearings on this matter were held by the board in 1985 and 1986, General Statutes (Rev. to 1985) § 20-25[3] required that the board consist of two chiro-

---

[2] The board concluded that the manipulation was used "at least in part for diagnostic purposes." The use of this procedure as a diagnostic technique is also referred to as "stressology."

[3] "[General Statutes (Rev. to 1985)] § 20-25. EXAMINING BOARD. The state board of chiropractic examiners shall continue to consist of three members, two of whom shall be practicing chiropractors and residents of this state and shall have practiced chiropractic continuously in this state for at least three years, and one of whom shall be a public member. The governor shall appoint a chairman from among such members. Said board shall meet at least once during each calendar quarter and at such other times as the chairman deems necessary. Special meetings shall be held on the request of a majority of the board after notice in accordance with the provisions of section 1-21. Members shall not be compensated for their services but shall be reimbursed for necessary expenses incurred in the performance of their duties. Any member who fails to attend three consecutive meetings or who fails to attend fifty per cent of all meetings held during any calendar year shall be deemed to have resigned from office. Minutes of all meetings shall be recorded by the board. No member shall participate in the affairs of the board during the pendency of any disciplinary proceedings by the board

practors and one public member. One of the chiropractic members, Lewis Labbadia, recused himself from this matter because he had filed a complaint with the department about the plaintiff's conduct. Because there was no public member of the board at the time of the hearings, the hearings were conducted solely by Marino Passero, the other chiropractor on the board at that time. After the hearings, Mary Coman was appointed as the public member of the board. She read the record of the hearings and discussed the matter with Passero, and the board subsequently issued its decision, which was signed by Passero and Coman.

During the hearings, the department withdrew three of the counts. The board dismissed or transferred to another state agency eight of the remaining counts, while it found in the department's favor on the other thirteen counts. The plaintiff then appealed that decision to the Superior Court pursuant to General Statutes § 4-183. After granting the plaintiff's motions to present evidence outside the record and to add to the record, the trial court sustained the plaintiff's appeal as to seven of the counts and dismissed the appeal as to the five other counts.[4] Each of those five counts concerns either the plaintiff's use of the coccygeal-meningeal manipulation or statements that he made regarding that procedure.

---

against such member. No professional member shall be an elected or appointed officer of a professional society of chiropractors or have been such an officer during the year immediately preceding his appointment. No member shall serve more than two full consecutive terms which commence after July 1, 1980. Said board shall (1) hear and decide matters concerning suspension or revocation of licensure, (2) adjudicate complaints against practitioners and (3) impose sanctions where appropriate."

[4] It appears from the record that the trial court misread the board's decision because the court stated that the board had dismissed count twenty-three when the board, in fact, had found in the department's favor on that count. Neither party raised this issue, however, and we do not address it.

On appeal, the plaintiff claims that the trial court incorrectly concluded that: (1) count twenty of the department's complaint adequately informed the plaintiff of the nature of the charge in that count; (2) the plaintiff waived the right to claim that the board's decision was not rendered on a timely basis because he did not avail himself of the remedy available under General Statutes (Rev. to 1985) § 4-180 (a) and (b); (3) the plaintiff received a fair hearing and was not denied his right to due process of law; (4) Passero's membership on the board was proper despite the fact that at the time of the hearings he was an officer of the Council of Chiropractic Education; (5) the board properly interpreted General Statutes § 20-28 (b) as defining limitations on chiropractic practice; (6) the board properly admitted into evidence an exhibit concerning schools and colleges of chiropractic approved by the board; and (7) the plaintiff had abandoned one of his claims by failing to brief that issue.[5] In their cross appeal, the defendants contend that the trial court improperly: (1) concluded that expert testimony was required to support some of the counts; and (2) allowed the plaintiff to conduct discovery after the hearing before the board and supplement the record of those proceedings.

I

The plaintiff claims that the twentieth count did not adequately inform him of the nature of the charge against him.[6] After the plaintiff filed a written request

___

[5] The plaintiff had argued before the trial court that the board's decision was void because the board did not serve the parties with a proposed final decision pursuant to General Statutes (Rev. to 1985) § 4-179. The trial court considered the merits of this claim and rejected it. The plaintiff's contention that the trial court deemed this claim abandoned is simply a misreading of the trial court's decision.

[6] The twentieth count stated: "In the course of diagnosing or treating Richard Benham, Jesse J. Jutkowitz, D.C. improperly prescribed 'meningeals,' also known as coccygeal-meningeal treatments, where not clinically

that the department state the basis for its claim that the coccygeal-meningeal manipulation was improperly prescribed and not clinically indicated, the department denied this request on the ground that there is no provision for discovery under the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq.[7] The trial court rejected the plaintiff's contention that his rights under the federal due process clause and under the UAPA were denied because of the alleged deficiency in the notice. The trial court also rejected the plaintiff's claim that the department's refusal to respond to his request for clarification violated General Statutes (Rev. to 1985) § 4-177 (b).[8] We agree with the trial court's conclusion that the charge was adequately stated.

General Statutes § 4-182 (c) provides that "[n]o revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action . . . ." In *Levinson* v. *Board of Chiropractic Examiners*, 211 Conn. 508, 534, 560 A.2d 403 (1989),

indicated, and thereby engaged in illegal, incompetent or negligent conduct in the practice of chiropractic thus violating § 20-29 of the Connecticut General Statutes."

[7] The board also refused to respond to the plaintiff's request for clarification of two of the other counts. Those counts, however, are not at issue in this appeal.

[8] General Statutes (Rev. to 1985) § 4-177 provides in pertinent part: "(a) In a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice.

"(b) The notice shall include: (1) A statement of the time, place, and nature of the hearing; (2) a statement of the legal authority and jurisdiction under which the hearing is to be held; (3) a reference to the particular sections of the statutes and regulations involved; (4) a short and plain statement of the matters asserted. If the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved. Thereafter upon application a more definite and detailed statement shall be furnished."

we noted that the notice requirements in § 4-182 (c) are stricter than those in § 4-177 (b) because the former proceeding involves a " 'more compelling private interest.' " When the potential result of an agency proceeding is the suspension of a license upon which a person depends in earning his or her living, " 'due process requires that the notice given must advise the party of the facts or conduct alleged to be in violation of the law and must fairly indicate the legal theory under which such facts are claimed to constitute a violation of the law.' " Id., 535, quoting *Hart Twin Volvo Corporation* v. *Commissioner of Motor Vehicles,* 165 Conn. 42, 47, 327 A.2d 588 (1973).

The language in the twentieth count informed the plaintiff that this charge arose from his prescribing the coccygeal-meningeal manipulation for Richard Benham. He was therefore fairly apprised of the facts or conduct that served as the basis for the department's charge. In addition, the count informed him that his conduct was alleged to be in violation of General Statutes § 20-29. His claim, in essence, is that he was never given notice of the legal theory under which those facts gave rise to the statutory violation. In its ruling on the twentieth count, the board indicated that the basis for its conclusion that the plaintiff had violated § 20-29 by prescribing the coccygeal-meningeal manipulation for Richard Benham was its conclusion that the use of this technique constituted incompetent practice. Although we note that the legal basis for the allegation in the twentieth count could have been expressed in clearer terms, we conclude that the notice provided was sufficient to satisfy the requirements of due process.[9]

---

[9] Our conclusion is supported by the fact that the eighth count alleged that the plaintiff had violated General Statutes § 20-29 in the treatment of Cheryl Benham by using a diagnostic manipulation that was not taught in any school approved by the board. That count informed the plaintiff that

Even if we were to conclude that the twentieth count failed to provide adequate notice to the plaintiff, our disposition of this issue would be the same because the plaintiff did not suffer material prejudice as a result of this alleged procedural deficiency. See General Statutes (Rev. to 1985) § 4-183 (g); *Murach* v. *Planning & Zoning Commission,* 196 Conn. 192, 205, 491 A.2d 1058 (1985). The plaintiff introduced evidence to attempt to show that the coccygeal-meningeal manipulation was taught at a chiropractic college and that the use or prescription of this procedure would not constitute incompetent practice.[10] The plaintiff, therefore, cannot now complain that his defense was prejudiced by any alleged deficiency in notice.

## II

The plaintiff next argues that the board's decision was void because it was not rendered within ninety

the board regarded the use of the coccygeal-meningeal manipulation as a per se violation of § 20-29.

We also reject the plaintiff's contention that the department was required to respond to his request for articulation of the twentieth count under the provisions of General Statutes (Rev. to 1985) § 4-177 (b). See footnote 8, supra. Those provisions require an agency, upon application, to furnish a more definite and detailed statement of the matters asserted *if* the initial notice includes only a statement of the issues involved. In this case, however, the notice provided to the plaintiff informed him not only of the issues involved, but also of the facts and conduct that served as the basis for the charge. Section 4-177 (b), therefore, is simply inapplicable in these circumstances.

[10] The plaintiff called Nicholas Wisniewski, a licensed chiropractor, who testified that in 1977 he took a two day course in stressology that was taught at the Palmer College of Chiropractic in Iowa. Wisniewski stated that the course was considered an extracurricular course separate from the normal class schedule, that it was not a part of the core curriculum of the school and that he had to pay a fee to take the course. He also testified that he did not know of any schools at which the course was being taught at the time of the hearing and that he did not know if the course had been offered at any time after 1977. The plaintiff also introduced evidence that a continuing education course in stressology was offered at Cleveland Chiropractic College in June, 1981.

days, as required by General Statutes (Rev. to 1985) § 4-180 (a).[11] The defendants concede that the board did not comply with the requirements of § 4-180 (a), but assert that the trial court properly concluded that the plaintiff had waived his right to challenge the timeliness of the board's ruling by not applying to the Superior Court pursuant to § 4-180 (b) for an order requiring the board to issue its decision.[12] We agree.

Section 4-180 (b) provides in part that "[i]f an agency fails to comply with the provisions of subsection (a) of this section in any contested case, any party thereto or any interested person may apply to the superior court . . . for an order requiring the agency to render a decision forthwith, after hearing." We have held that the failure to raise a procedural claim or the failure to utilize a remedy available to cure a procedural defect can constitute a waiver of the right to object to the alleged defect. See *Levinson* v. *Board of Chiropractic Examiners,* supra, 536 (plaintiff did not file an application for a more definite and detailed statement of the charges pursuant to General Statutes § 4-177 [b] [4]); *Henderson* v. *Department of Motor Vehicles,* 202 Conn. 453, 461--63, 521 A.2d 1040 (1987) (failure to raise claim that adjudicator should be disqualified within reason-

[11] General Statutes (Rev. to 1985) § 4-180 provides in pertinent part: "FINAL DECISION TO BE RENDERED WITHIN NINETY DAYS. APPLICATION TO COURT UPON AGENCY FAILURE. (a) Each agency shall proceed with reasonable dispatch to conclude any matter pending before it and shall render a final decision in all contested cases within ninety days following the close of evidence and filing of briefs in such proceedings.

"(b) If any agency fails to comply with the provisions of subsection (a) of this section in any contested case, any party thereto or any interested person may apply to the superior court for the judicial district of Hartford-New Britain for an order requiring the agency to render a decision forthwith, after hearing. The court shall issue such order unless the agency establishes to the satisfaction of the court reasonable cause for such failure."

[12] Because we conclude that the plaintiff waived any procedural defect by failing to avail himself of the remedy provided by General Statutes (Rev. to 1985) § 4-180 (b), we do not address whether the timeliness requirements of § 4-180 (a) are mandatory or directory.

able time of learning of basis for disqualification); *Welch* v. *Zoning Board of Appeals,* 158 Conn. 208, 213–14, 257 A.2d 795 (1969) (failure to object at zoning hearing to reading into the record a letter in opposition to plaintiffs' application for approval); see also *Cantor* v. *Department of Income Maintenance,* 12 Conn. App. 435, 436–37 n.2, 531 A.2d 606 (1987); *Curry* v. *St. Louis County,* 773 S.W.2d 499, 502 (Mo. App. 1989) (no due process violation despite delay in issuance of administrative decision where appellant did not utilize statutory remedy to prevent unreasonable delay). We conclude that the plaintiff waived his right to object to the board's noncompliance with § 4-180 (a) by not invoking the remedy provided in § 4-180 (b).[13]

### III

The plaintiff further asserts that his rights to due process and a fair hearing were violated because: (1) coun-

---

[13] The plaintiff's reliance on *Bogaert* v. *Zoning Board of Appeals,* 162 Conn. 532, 294 A.2d 573 (1972), and *Statewide Grievance Committee* v. *Rozbicki,* 211 Conn. 232, 558 A.2d 986 (1989), is misplaced. In *Bogaert* v. *Zoning Board of Appeals,* supra, 536–38, we held that the provisions of General Statutes § 51-29 (amended and recodified as General Statutes § 51-183b), which set forth the time limits for the rendering of judgments in civil actions, are mandatory, but that those limits can be waived. We noted that in certain circumstances a party's failure to object to the timeliness of a decision until after judgment is rendered can constitute a waiver of that defect if there is "some duty or occasion to speak or act." Id., 538. Here, the existence of the statutory remedy in General Statutes (Rev. to 1985) § 4-180 (b) provided an occasion and a duty to raise the issue.

In *Statewide Grievance Committee* v. *Rozbicki,* supra, 240–46, we concluded that the time limitations in General Statutes § 51-90g (c) are mandatory but that the existence of a violation of those provisions did not mandate that a complaint necessarily be dismissed. This conclusion was based in part on the need to give effect to statutory language providing that, if a decision is delayed beyond the statutory period, the grievance committee must " 'determine the appropriate course of action.' " Id., 242–43. Similarly, the existence of the remedy provided in § 4-180 (b) supports the proposition that a violation of the timeliness provisions of § 4-180 (a) does not invalidate a decision of the board, and that the failure to employ this remedy constitutes a waiver of the violation. The plaintiff's construction of this statute would render § 4-180 (b) a mere nullity.

sel for the department referred to unsuccessful settlement negotiations; (2) the legal advisor for the board allegedly assumed the role of an advocate at one point during the hearings; and (3) Passero, the board member who presided at the hearings, should have recused himself on the basis of his professional relationship with a chiropractor who had treated one of the patients involved in this case. We reject each of these claims.

## A

We have stated that " 'not all procedural irregularities require a reviewing court to set aside an administrative decision; material prejudice to the complaining party must be shown.' " *Murach* v. *Planning & Zoning Commission,* supra, 205; see General Statutes (Rev. to 1985) § 4-183 (g). The trial court concluded that counsel for the department should not have referred to settlement negotiations during the final hearing, but that those remarks had not materially prejudiced the plaintiff. We agree.[14]

The general rule that evidence of settlement negotiations is not admissible at trial is based upon the public policy of promoting the settlement of disputes. *Simone Corporation* v. *Connecticut Light & Power Co.,*

---

[14] After the attorney for the department had completed his closing remarks, Passero, the board member who presided at the hearings, asked, "[i]f the Board finds that there is validity to the charges, what type of sanctions would you recommend?" Counsel for the department responded, "I really, it's difficult to say. The Department has an opinion but we're really acting in a vacuum as to not having any prior cases of this like to judge as to the appropriate discipline so we have an opinion, we made an offer but that offer is, well, it was difficult to make any offer to determine how to handle the case, how to settle the case because of that fact. It's not the type of action where, for instance, if it was a nursing case, and we've had countless nursing cases with all degrees of problems and we've gotten some feedback from the Board and because of that we can judge and have some type of determination as to the appropriate—judging from our understanding of the case we would say a substantial suspension, but that is, again, caveat being it's being based on, not any Board decision."

187 Conn. 487, 490, 446 A.2d 1071 (1982); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.5.4 (b). Although hearings before administrative agencies are not governed by the strict rules of evidence, they " 'must be conducted so as not to violate the fundamental rules of natural justice.' " *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 536, 525 A.2d 940 (1987), quoting *Connecticut Fund for the Environment, Inc.* v. *Stamford,* 192 Conn. 247, 249, 470 A.2d 1214 (1984). Allowing evidence of settlement negotiations to be admitted at administrative hearings is inconsistent with both fundamental principles of justice and with the public policy of encouraging settlements. We conclude, therefore, that evidence of attempts at settlement is generally not admissible at adjudicative hearings by agencies.

In this case, however, counsel for the department referred only to the fact that the department had made a settlement "offer." The terms of the offer were not disclosed. There was no suggestion that the plaintiff responded to the offer, or even participated in settlement negotiations. On the basis of this record, therefore, we conclude that the plaintiff was not prejudiced by this procedural irregularity.

### B

The plaintiff next claims that his rights to due process and a fair hearing were violated and that his right to present a defense was hindered by the adversarial role allegedly assumed by the counsel for the board during the final hearing. The trial court dismissed this claim, concluding that the plaintiff had not suffered any material prejudice.

During each of the three hearings, an attorney from the attorney general's office was present to advise the board on any legal rulings it was required to make and to assist the board in the fact gathering process. The

attorney stated that his role was not that of an advocate, but that he would ask questions of the witnesses concerning the matters before the board, particularly matters not directly related to the merits of the case. During the third hearing, the board's attorney asked a series of questions of Nicholas Wisniewski, a chiropractor who testified for the plaintiff. These questions were directed to testimony by Wisniewski about a Colorado case in which he had testified regarding the propriety of a chiropractor's diagnosis and treatment of spinal problems. Although Passero overruled the plaintiff's objection to the questioning of Wisniewski by the board's attorney, shortly thereafter he sustained the plaintiff's objection to further questioning concerning the Colorado case on the ground that it was "too far afield."

We need not address whether counsel for the board did, in fact, improperly assume the role of an advocate at the hearing because we conclude that the plaintiff did not suffer material prejudice from the line of questioning at issue here. See General Statutes (Rev. to 1985) § 4-183 (g); *Murach* v. *Planning & Zoning Commission,* supra. These questions were directed at such a tangential issue that Passero subsequently discontinued the entire line of inquiry. In light of the fact that the questioning by the counsel for the board was of little import, the plaintiff cannot rely on it to establish his due process claim.

### C

The plaintiff contends that Passero should have recused himself from this case. The basis for his claim is the fact that Mark Spivey, one of the plaintiff's patients whose treatment gave rise to the disciplinary action, consulted a chiropractor, Donald J. Lawlor, who was a member of the same "chiropractic group" as Passero. Lawlor was instrumental in the filing of the counts

against the plaintiff related to Spivey's treatment. The trial court concluded that the "tenuous relationship" between Passero and Lawlor did not require that Passero recuse himself. We agree.

It is presumed that members of administrative boards acting in an adjudicative capacity are unbiased. *Petrowski* v. *Norwich Free Academy*, 199 Conn. 231, 236, 506 A.2d 139, appeal dismissed, 479 U.S. 802, 107 S. Ct. 42, 93 L. Ed. 2d 5 (1986); see *Withrow* v. *Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975). The party who contends that an adjudicator is biased bears the burden of proving the disqualifying interest. *Schweiker* v. *McClure*, 456 U.S. 188, 196, 102 S. Ct. 1665, 72 L. Ed. 2d 1 (1982); *Petrowski* v. *Norwich Free Academy*, supra.

"The applicable due process standards for disqualification of administrative adjudicators do not rise to the height of those prescribed for judicial disqualification. *Schweiker* v. *McClure*, supra. The canons of judicial ethics go far toward cloistering those who become judges, the ultimate arbiters of constitutional and statutory rights, from all extraneous influences that could even remotely be deemed to affect their decisions. Such a rarified atmosphere of impartiality cannot practically be achieved where the persons acting as administrative adjudicators, whose decisions are normally subject to judicial review, often have other employment or associations in the community they serve. It would be difficult to find competent people willing to serve, commonly without recompense, upon the numerous boards and commissions in this state if any connection with such agencies, however remotely related to the matters they are called upon to decide, were deemed to disqualify them. Neither the federal courts nor this court require a standard so difficult to implement as a prerequisite of due process of law for administrative adjudication." *Petrowski* v. *Norwich Free Academy*, supra, 238.

The evidence in the record supports the trial court's conclusion that the plaintiff's rights to a fair trial and due process were not violated by Passero's refusal to recuse himself. Passero and Lawlor were both members of the Norwalk Chiropractic Group, Inc. That group was a service corporation that paid the expenses of operating the building where its five chiropractor members worked. The building was owned by Passero and another member of the group. Each of these chiropractors acted as independent subcontractors and paid rent to the corporation to cover the cost of maintaining the facility. Each had separate practices and collected their own fees. The group was not a professional corporation, and there was no sharing of income or funds between the members. Passero never discussed this case with Lawlor and he first learned of Lawlor's involvement in this matter at the initial hearing.

The plaintiff has failed to prove that Passero "had a disqualifying interest sufficient to overcome the 'presumption of honesty and integrity' . . . . *Withrow* v. *Larkin,* supra, 47." *Petrowski* v. *Norwich Free Academy,* supra, 238. We conclude, therefore, that the evidence clearly supported the trial court's conclusion that the relationship between Lawlor and Passero did not require that the latter recuse himself from this matter.

IV

General Statutes (Rev. to 1985) § 20-25 provides in part that "[n]o professional member [of the board of chiropractic examiners] shall be an elected or appointed officer of a *professional society of chiropractors* or have been such an officer during the year immediately preceding his appointment." (Emphasis added.) At the time of the plaintiff's hearings before the board, Marino Passero, the only professional member of the board who participated in the board's decision to discipline

the plaintiff, was president of the Council of Chiropractic Education. The plaintiff renews on appeal his claim that the Council of Chiropractic Education is a "professional society of chiropractors" within the meaning of § 20-25 and, therefore, that the board was not properly constituted. We disagree.

The only evidence in the record concerning the Council of Chiropractic Education came from a statement made by Passero. He indicated that the members of this council are educational institutions and a commission on accreditation. He also stated that membership is "not open to the field."[15]

The language of § 20-25 is ambiguous as to whether this provision applies to the Council of Chiropractic Education. " 'Where the words of a statute fail to indicate clearly whether the provision applies in certain circumstances, it must be construed by this court . . . .' *Board of Trustees* v. *Freedom of Information Commission,* 181 Conn. 544, 550, 436 A.2d 266 (1980). Under our rules of statutory construction, this court is to be guided by the language, purpose and legislative history of the statute in question." *Zichichi* v. *Middlesex Memorial Hospital,* 204 Conn. 399, 405, 528 A.2d 805 (1987).

We conclude that the legislature, when it enacted § 20-25, did not intend to include within the meaning of the term "professional society of chiropractors" an

---

[15] Passero stated: "I am currently the President on [sic] the Council of Chiropractic Education. It is not a professional society. It is a quasi-governmental, voluntary accrediting agency, approved by the United States Department of Education and is a member of the council on post-secondary education. There are no members to this other than institutions, colleges as well as a commission on accreditation which accredits colleges. It is not open to the field; it is not a trade association, not a professional society, so to speak." Passero indicated that the purpose of the organization is to accredit chiropractic colleges.

organization whose membership is not generally open to members of the profession and whose principal function is to accredit educational institutions in that field. The legislative history on this issue, albeit limited, supports this conclusion.[16] In addition, the defendant has suggested no viable reason, and we can conceive of none, why the legislature would wish to exclude from the board a professional who was an officer of an organization of the nature of the Council of Chiropractic Education.[17]

---

[16] This particular provision of General Statutes (Rev. to 1985) § 20-25 is similar to provisions concerning the examining boards for other professionals in the health field. See, e.g., General Statutes § 20-8 (homeopathic physicians); General Statutes § 20-8a (medical doctors); General Statutes § 20-15 (osteopathic physicians); General Statutes § 20-35 (natureopathic examiners); General Statutes § 20-88 (nurses). Each of these provisions was embodied in Public Acts 1980, No. 80-484, which was enacted in response to the review of examining boards mandated by the Connecticut Sunset Law. See General Statutes § 2c-1.

" 'In construing a statute and determining the legislative intent, we may take judicial notice of the discussions on the floor of the General Assembly although such discussions are not controlling on statutory interpretation. . . .' " (Citations omitted.) *American Universal Ins. Co. v. DelGreco,* 205 Conn. 178, 195–96 n.8, 530 A.2d 171 (1987). The only references to this provision in the legislative history were made during the debate over an amendment that, among other things, changed the duration of the period during which a former officer of a professional society is barred from serving on an examining board from three years to one year. Representative Robert Carragher stated that "under the bill, if any individual served as an officer of a *professional association,* that individual would be prohibited for three years from being a member of any of these professional boards or commissions. Under the amendment, that three years would be replaced by one year." (Emphasis added.) 23 H.R. Proc., Pt. 26, 1980 Sess., p. 7655. Senator Wayne Baker made the following remark concerning this provision: "[W]ith reference to revolving door, no one can have been an elected official of *his or her professional society or association* for one year before being appointed to any of the boards. The file copy had talked of three years." (Emphasis added.) 23 S. Proc., Pt. 12, 1980 Sess., p. 4081. Senator Baker's reference to "his or her professional society" connotes a group whose membership is generally open to the profession.

[17] The plaintiff asserts that there is a relationship between this issue and the plaintiff's claim that General Statutes § 20-28 (b) (2) should not be interpreted as barring the use of diagnostic methods not taught at chiropractic

Our conclusion is also supported by the principle that " '[n]o word in a statute should be treated as superfluous, void or insignificant unless there are impelling reasons . . . why this principle cannot be followed.' " *Hartford Principals' & Supervisors' Assn.* v. *Shedd,* 202 Conn. 492, 506, 522 A.2d 264 (1987). Section 20-25 refers to a "professional society *of chiropractors.*" (Emphasis added.) Passero indicated that the members of the Council on Chiropractic Education are educational institutions and the individuals who make up the accreditation commission. Although it is not clear from the record whether individuals are appointed to represent member institutions, or whether such individuals include both chiropractors and nonchiropractors, this limited evidence of the membership structure of the Council of Chiropractic Education does not support the plaintiff's contention that this organization is a "professional society of chiropractors" within the meaning of § 20-25.

## V

The plaintiff argues that the board and the trial court improperly interpreted General Statutes § 20-28 (b) (2),[18]

---

schools approved by the board. In effect, he contends that it is unfair to have a person who has a role in determining what schools are accredited also determine whether a given person has used a procedure not taught at a school approved by the board. We disagree. Although the board relies on the Council of Chiropractic Education in determining which schools of chiropractic to recognize and approve, this fact did not affect the ability of Passero to evaluate without prejudice whether the plaintiff had in fact used a diagnostic method not taught at an approved school.

[18] General Statutes § 20-28 (b) provides: "Any chiropractor who has complied with the provisions of this chapter may:

"(1) Practice chiropractic as defined in section 20-24, but shall not prescribe for or administer to any person any medicine or drug included in materia medica, except vitamins, or perform any surgery or practice obstetrics or osteopathy;

"(2) Examine, analyze and diagnose the human living body and its diseases, and use for diagnostic purposes the x-ray or any other general method

which provides that "[a]ny chiropractor who has complied with the provisions of this chapter may . . . [e]xamine, analyze and diagnose the human living body and its diseases, and use for diagnostic purposes the x-ray or any other general method of examination for diagnosis and analysis taught in any school or college of chiropractic which has been recognized and approved by the state board of chiropractic examiners." In its memorandum of decision, the board stated that the plaintiff's use of the coccygeal-meningeal manipulation on Cheryl Benham for diagnostic purposes constituted illegal conduct in violation of § 20-28 (b) (2) because that procedure "was not part of the core curriculum of any school or college of chiropractic approved by the Board at any relevant time in this case." The trial court agreed with that interpretation of § 20-28 (b) (2). The plaintiff now contends that § 20-28 (b) (2) merely establishes the scope of diagnostic techniques that are presumptively valid, and that this section does not limit chiropractors to the use of diagnostic techniques that are taught at a school or college of chiropractic approved by the board. We disagree.[19]

of examination for diagnosis and analysis taught in any school or college of chiropractic which has been recognized and approved by the state board of chiropractic examiners;

"(3) Treat the human body by manual, mechanical, electrical or natural methods, or by use of physical means, including light, heat, water or exercise in preparation for chiropractic adjustment or manipulation, and by the oral administration of foods, food concentrates, food extracts or vitamins;

"(4) Administer first aid and, incidental to the care of the sick, advise and instruct patients in all matters pertaining to hygiene and sanitary measures as taught and approved by recognized chiropractic schools and colleges."

[19] The issue raised by the plaintiff is solely whether General Statutes § 20-28 (b) (2) establishes the boundary of diagnostic procedures that a chiropractor can use lawfully. The plaintiff does not challenge, and we do not address, whether the board properly concluded that a diagnostic technique must be part of the *core curriculum* of an approved school of chiropractic in order to fall within the scope of procedures allowed under § 20-28 (b) (2).

"Ordinarily, the construction and interpretation of a statute is a question of law for the courts where the administrative decision is not entitled to special deference, particularly where, as here, the statute has not previously been subjected to judicial scrutiny or time-tested agency interpretations." *New Haven* v. *Freedom of Information Commission,* 205 Conn. 767, 773–74, 535 A.2d 1297 (1988); *Texaco Refining & Marketing Co.* v. *Commissioner of Revenue Services,* 202 Conn. 583, 599, 522 A.2d 771 (1987). Although we need not defer to the board's interpretation of § 20-28 (b) (2), we conclude that the board properly construed this provision.

We reject the plaintiff's contention that § 20-28 (b) (2) is unambiguous and that its plain language, namely, the use of the term "may," mandates that this provision be construed as merely establishing that the use of certain diagnostic procedures by chiropractors is presumptively valid. " 'It is an elementary rule of construction that statutes should be considered as a whole, with a view toward reconciling their separate parts in order to render a reasonable overall interpretation . . . .' *La Providenza* v. *State Employees' Retirement Commission,* 178 Conn. 23, 29, 420 A.2d 905 (1979)." *Dukes* v. *Durante,* 192 Conn. 207, 214, 471 A.2d 1368 (1984). When § 20-28 (b) (2) is read in conjunction with the other subdivisions of § 20-28 (b), it is evident that in each of these provisions the legislature was attempting to establish limits on the practice of chiropractic.

Construing § 20-28 (b) (2) as limiting chiropractors to the use of diagnostic procedures taught in schools recognized and approved by the board is also consistent with the licensing provisions applicable to chiropractors. One of the conditions for obtaining a chiropractic license is graduation from an accredited school approved by the board, the same bench mark used in § 20-28 (b) (2). See General Statutes § 20-27. Moreover, our conclusion that § 20-28 (b) (2) sets limits on what

diagnostic techniques a chiropractor is allowed to use is supported by the legislative history of § 20-28 (b).[20]

The plaintiff argues that the effect of the board's interpretation of § 20-28 (b) (2) is to restrict the use of new diagnostic techniques that are not yet taught in approved colleges of chiropractic and thereby limit advancement in chiropractic care. While the plaintiff may indeed be correct in this assertion, we have concluded that the legislature, when it enacted § 20-28 (b) (2), intended to set limits on the diagnostic techniques that chiropractors can employ. The policy issue raised by the plaintiff, therefore, should be addressed to the legislature rather than this court.

## VI

As his final claim, the plaintiff argues that the board improperly admitted into evidence exhibit N and that he suffered substantial prejudice as a result of the admission of this exhibit. Exhibit N included a list of accredited schools and colleges of chiropractic approved by the board as of February, 1983, and the plaintiff's claim is based on the admission of this list.[21] The list

---

[20] Subdivisions (2), (3) and (4) of General Statutes § 20-28 (b) were added in 1976. See Public Acts 1976, No. 76-83, § 2. Representative John Morrison stated that "this bill simply updates the definition of the practice of chiropractic [in General Statutes § 20-24]. *It specifies in greater detail what a chiropractor may or may not do.* The bill describes in detail the various methods a chiropractor may use to diagnose and to apply proper treatment for his patients." (Emphasis added.) 19 H.R. Proc., Pt. 4, 1976 Sess., p. 1336.

[21] The first page of exhibit N is a list of chiropractic schools approved by the board. The succeeding pages of the exhibit are copies of letters sent to Lewis Labbadia, D.C., a member of the board, from schools appearing on that list in response to a letter sent by Labbadia inquiring whether stressology was being taught at those schools or whether it was the subject of research. "Stressology" is a procedure involving manipulation of the coccyx to determine meningeal tension. Each of the schools on the list answered "no" to both of these questions. Although at the hearing the plaintiff objected to the admission of these letters as well as to the list of the schools, in his brief the plaintiff refers only to the list of schools. We conclude, therefore, that he has abandoned his claim of inadmissibility with respect to the letters. See *Aillon* v. *Meachum,* 211 Conn. 352, 356 n.4, 559 A.2d 206 (1989).

was relevant to the determination of whether the coccygeal-meningeal manipulation was taught at any chiropractic schools approved by the board. The plaintiff contends that this list should not have been admitted by the board because it was hearsay and because a proper foundation was not laid.[22] We disagree.

"We note first that administrative tribunals are not strictly bound by the rules of evidence and that they may consider evidence which would normally be incompetent in a judicial proceeding, as long as the evidence is reliable and probative. *Lawrence* v. *Kozlowski*, 171 Conn. 705, 710, 372 A.2d 110, cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977); *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles*, 165 Conn. 559, 570, 345 A.2d 520 (1973). There is moreover no specific prohibition against hearsay evidence in the Uniform Administrative Procedure Act, which provides that '[a]ny oral or documentary evidence may be received, but [that] the agency shall, as a matter of policy, provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence.' General Statutes § 4-178 (1)." *Tomlin* v. *Personnel Appeal Board*, 177 Conn. 344, 348, 416 A.2d 1205 (1979). "[W]hen a hearing will be expedited and the interests

[22] The plaintiff also contends that the list was improperly admitted because it was dated February, 1983, and the hearings were held in 1985 and 1986. The plaintiff's argument assumes that the relevant issue was whether the coccygeal-meningeal manipulation was taught at any chiropractic school approved by the board at the time of the hearings. The department asserts, however, that the date that the procedure was used is the relevant date for the purpose of determining whether the plaintiff violated General Statutes § 20-28 (b) (2) by using a diagnostic procedure not taught at any approved school. We agree with the department's interpretation of § 20-28 (b) (2) because it would be patently unfair to judge the lawfulness of the use of a particular chiropractic technique by whether that technique is taught at an approved school at some time in the future. The plaintiff performed and prescribed the use of the coccygeal-meningeal manipulation for the Benhams in 1982, and the plaintiff has made no showing that the list of schools recognized by the board in 1983 varied from the 1982 list. We therefore reject this claim of error.

of the parties will not be prejudiced substantially, any part of the evidence may be received in written form." General Statutes (Rev. to 1985) § 4-178 (1).

We conclude that the list of accredited and approved schools was both reliable and probative. The list was obtained from the licensing division of the department of health services. Referring to this list, Passero, the board member who presided at the plaintiff's hearings, stated that each year the board sends to the licensing division its updated list of the approved schools and colleges of chiropractic after obtaining from the Council of Chiropractic Education the names of accredited schools. General Statutes § 20-27 (d) requires that the board prepare this list annually. Under these circumstances, the plaintiff cannot seriously contend that there was an insufficient foundation for the admission of this list or that the list was not probative or sufficiently trustworthy. We conclude, therefore, that the list of chiropractic schools approved by the board was properly admitted.

VII

In the cross appeal, the defendants contend that the trial court improperly concluded that the department was required to present expert testimony to support seven of the counts against the plaintiff. The board members who decided the plaintiff's case were Passero, a licensed chiropractor, and Mary Coman, the public member of the board who possessed no expertise in chiropractic.[23] In reaching its conclusion that expert testimony was required for seven of the counts, the trial court relied on our decision in *Levinson* v. *Board of Chiropractic Examiners,* 211 Conn. 508, 525, 560 A.2d 403 (1989), in which we stated that an administrative board hearing and deciding a licensing case must con-

---

[23] Although Coman did not attend the hearing, she read the record of the hearing and discussed the case with Passero.

sist of a majority of experts in order to obviate the need for expert testimony on issues whose determination requires knowledge of standards of professional conduct.

In this case, because the board that decided the matter did not consist of a majority of expert members, the trial court sustained the plaintiff's appeal as to the seven counts that required the presentation of expert evidence. The defendants contend that the "majority of experts" requirement set forth in *Levinson* applies only to the statutory composition of the board, not to the membership of the panel that actually hears and decides a case. Alternatively, the defendants argue that the presence of a single expert on the panel that hears and decides a case is sufficient. We disagree with both of these arguments.

The defendants' first argument is without merit. In *Jaffe* v. *Department of Health,* 135 Conn. 339, 348–50, 64 A.2d 330 (1949), we stated that because the medical examining board at that time was composed exclusively of medical professionals, the board was competent to determine whether the conduct of a physician was in accordance with the standards of the profession without hearing expert evidence. Accord *Leib* v. *Board of Examiners for Nursing,* 177 Conn. 78, 89, 411 A.2d 42 (1979). In *Levinson* v. *Board of Chiropractic Examiners,* supra, we considered whether our decision in *Jaffe* was undercut by the passage of Public Acts 1977, No. 77-614, § 362, which changed the composition of the chiropractic examining board from three chiropractors to two chiropractors and one public member.[24] We concluded that "the rationale of *Jaffe* survives the addition of a public member to the board. As

[24] Public Acts 1988, No. 88-248, § 6, increased the total number of members on the board from three to seven. Of this number, four members must be practicing chiropractors and the other three positions on the board are for public members. See General Statutes § 20-25.

long as *the board hearing and deciding a licensing matter* is composed of at least a majority of experts in the field involved in the case, the board may rely on its own expertise in evaluating charges against persons licensed by the board and the requisite standard of care by which to judge such cases." (Emphasis added.) Id., 525.

We are not persuaded by the defendants' tortured interpretation of *Levinson.* In *Levinson,* the board that heard and decided the case consisted solely of chiropractors, and therefore the narrow issue was whether our holding in *Jaffe* v. *Department of Health,* supra, was eviscerated by the mere existence of public members on the statutory board. *Levinson* v. *Board of Chiropractic Examiners,* supra. Both the rationale of our decision in that case and the dictates of common sense, however, make it clear that the relevant bench mark in determining whether expert testimony is necessary is the composition of the board that actually hears and decides the case, not the statutory composition of the board. Id., 524–27.

We also reject the defendants' assertion that, in the absence of expert testimony, the presence of a single expert on the board that hears and decides a case is adequate, as opposed to the rule adopted in *Levinson* requiring at least a majority of experts. Our decision in that case implicitly recognized the risk that, when considering matters that require knowledge of the standards of a profession, the public members of the board will simply defer to the expert members in the absence of expert testimony. This risk is clear in the context of the present case, where the board was composed of only one chiropractor and one public member. In order to ensure against this risk, we held in *Levinson,* and we reaffirm today, that expert testimony is necessary in a licensing matter unless the board that hears

and decides a case is composed of at least a majority of experts in the field.[25]

The judgment is affirmed.

In this opinion the other justices concurred.

[25] The defendants also raise in their cross appeal the issue whether the trial court properly allowed the plaintiff to present evidence to the trial court outside the agency record and to conduct discovery in furtherance of that purpose. Pursuant to these rulings, the trial court allowed the plaintiff to depose the board members who decided this matter. We decline to address this issue, however, because it has no bearing on the appeal in light of our disposition of the first issue raised by the defendants in their cross appeal. The trial court sustained the plaintiff's appeal only as to those counts that it concluded required the presentation of expert testimony, and we have rejected the defendants' cross appeal on that issue. Therefore, even if we were to conclude that the trial court should not have allowed the plaintiff to conduct discovery and present additional evidence, we would still affirm the trial court's decision to dismiss those counts for which expert testimony was required. We therefore do not address this claim.